UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID PRINGLE,<br><br>　　　　　　　　Petitioner,<br><br>　v.<br><br>D.L. RUNNELS, et al.,<br><br>　　　　　　　　Respondents. | Civil No.　07-cv-1960-LAB (POR)<br><br>**REPORT AND RECOMMENDATION THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED** |

On January 9, 2009, state prisoner David Pringle ("Petitioner" or "Pringle"), assisted by counsel, filed a Third Amended Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. 69.] The Petition challenges his August 17, 1984 convictions by a jury, in San Diego County Superior Court, for kidnapping to commit robbery, robbery, rape, and unlawfully taking a motor vehicle. Petitioner seeks habeas relief on the sole ground of a freestanding claim of actual innocence. After thorough consideration of the lodged record, controlling legal authority, and for the reasons discussed below, it is RECOMMENDED that the Petition be **DENIED** in its entirety.

## I.　FACTUAL AND PROCEDURAL BACKGROUND

### A.　Petitioner's Conviction

Upon leaving a store on January 10, 1984, Desiree Coleman was forced into her vehicle by two men and robbed. (Cal. Court of Appeal's opinion of Jan. 8, 1986 [Lodg. 2] at 2.) After the robbery, the men drove Coleman to a dark residential area where she was raped by both men. Id. The men then drove and released Coleman near her home. Id. The only witness to this incident was Darren Wells who saw Coleman abducted at the parking lot of the store. Id. Wells contacted the

police, gave a statement of the incident, and described the assailants, but he did not identify either assailant by name.  Id.

Approximately two weeks after the incident, Frederick Daye was arrested and identified by Coleman as one of her attackers.  (Pet'r's Mem. at 4-5.)[1]  Petitioner was arrested approximately three months after the incident when witness Darren Wells, in jail at the time on an unrelated matter, identified Petitioner as one of the attackers.  (Cal. Court of Appeal's opinion of Jan. 8, 1986 [Lodg. 2] at 2.)

Petitioner and his co-defendant, Daye, were tried separately for car theft and the kidnapping and rape of Coleman.  (Pet'r's Mem. at 6.)  At the separate trials, the prosecution relied upon the eyewitness statements of Coleman and Wells, as well as blood evidence taken from semen stains found on Coleman's clothing and in the car.  (Cal. Court of Appeal's opinion of Jan. 8, 1986 [Lodg. 2] at 3.).  Daye did not testify on his own behalf and was convicted of all charges brought against him.  (Pet'r's Mem. at 6.)

In his own trial, Petitioner testified that he was driving a friend, Ethel Gonzalez, to the Metropolitan Correctional Center ("MCC") at the same time Coleman was abducted by the two men.  (Cal. Court of Appeal's opinion of Jan. 8, 1986 [Lodg. 2] at 3-4.).  Several witnesses, including Gonzalez, testified in support of Petitioner's alibi.  Id.  However, on August 17, 1984, the jury convicted Petitioner on all counts and sentenced him to an "indeterminate term of life with the possibility of parole."  (Cal. Superior Court's habeas opinion of April 5, 2006 [Lodg. 11] at 1.)  On January 8, 1986, the California Court of Appeal affirmed the judgment.  [Lodg. 2.][2]

**B.      Co-Defendant Daye's Exoneration**

During the original investigation, police had found and collected four semen samples from

---

[1] The Third Amended Petition presents its "Grounds for Relief," including statement of facts, by incorporating by reference Petitioner's memorandum of points and authorities in support of his motion to amend the previous petition [Doc. 46-1](hereinafter "Pet'r's Mem.").

[2] It is not clear whether Petitioner sought further review by the California Supreme Court.  For example, the Third Amended Petition indicates that Petitioner did not seek review by the California Supreme Court, and Respondent's lodgments do not include any evidence of such a petition for review.  However, the published version of the decision by the Court of Appeal states, "Appellant's petition for review by the Supreme Court was denied May 22, 1986."  People v. Pringle, 177 Cal. App. 3d 785, 791 (1986)(as displayed by Westlaw).

1  the left knee, right knee, and crotch area of Coleman's jeans, and a stain on the carpet of the car.
2  (Pet'r's Mem. at 8-9.)  In October 1993, with the assistance of counsel, Petitioner's co-defendant,
3  Daye, obtained and submitted the four semen samples to Cellmark, a DNA testing lab. Id. at 8.  In
4  April 1994, Cellmark delivered the results of the tests, which demonstrated that Daye was not the
5  source for the left knee stain. Id.  The test provided no conclusions as to any of the other stains. Id.
6        The Government then conducted its own tests on the three stains from Coleman's jeans, but
7  not the carpet stain. (Pet'r's Mem. at 8.)  First, the results proved inconclusive as to the right knee
8  stain.  Second, the test concluded that neither Petitioner nor Daye was the source for the left knee
9  stain.  Third, the government interpreted the results to conclude that Petitioner's DNA was
10 "consistent" with the crotch stain sample.  More specifically, "Pringle, along with 1 in every 2000
11 African Americans, had a DNA marker that would be consistent with the DNA marker found in the
12 [crotch] semen stain." Id.  Based upon these results, the Government deemed Daye innocent of the
13 crimes for which he had been incarcerated, and Daye was released from custody. Id.
14        Later, Cellmark released a second report in which it determined Petitioner could not have
15 been the source for the left knee stain. (Pet'r's Mem. at 8.)  However, Cellmark did not reach a
16 conclusion with respect to the carpet stain, and the lab did not receive samples from either the crotch
17 or right-knee stain. Id.
18 **C.    Petitioner's Notice of DNA Test Results**
19        The test results from both Cellmark and the government were given to Petitioner's trial
20 attorney, who allegedly did not inform Petitioner of the results. (Pet'r's Mem. at 9.)  In June 2005,
21 Petitioner wrote his attorney asking for his case file. Id.  His attorney sent a package that included
22 the DNA tests. Id.  Petitioner was in administrative segregation at the time the package arrived, and
23 as a result, did not receive the package until October 2005. Id.
24 **D.    State Habeas Petitions**
25        On February 15, 2006, proceeding *pro se*, Petitioner filed a state habeas petition in San
26 Diego County Superior Court, which alleged, among other claims, actual innocence. [Lodg. 11 at
27 2.]  The court denied the petition on April 5, 2006, holding that Petitioner had failed to sufficiently
28 explain the delay in filing his petition and, moreover, that he could not make out a claim of actual

innocence because the DNA testing had proved inconclusive. Id. at 3-4. There is no evidence that Petitioner filed a state habeas petition with the California Court of Appeal.[3] On August 1, 2007, Petitioner filed a habeas petition in the California Supreme Court, which was denied on January 16, 2008. [Lodg. 1.]

**E.     Federal Habeas Petition**

On October 9, 2007, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. 1.] On October 17, 2007, this Court dismissed Petitioner's case without prejudice for his failure to pay the filing fee or move to proceed *in forma pauperis*, in addition to his failure to name a proper Respondent. [Doc. 3.] On October 26, 2007, Petitioner filed a First Amended Petition in which he named a proper Respondent, but he again failed to pay the filing fee and move to proceed *in forma pauperis*. [Doc. 5.] The Court again dismissed the Petition. [Doc. 7.] On December 19, 2007, Petitioner filed a Second Amended Petition [Doc. 9], in which Petitioner raised two grounds for relief: (1) violation of equal protection rights due to prosecutorial misconduct; and (2) violation of right to a trial by jury when trial judge determined aggravating factors for sentencing. [Doc. 9.] On June 9, 2008, Respondents filed a motion to dismiss the Second Amended Petition for violation of AEDPA's one-year statute of limitations. [Doc. 19.]

On July 21, 2008, in the interests of justice, the Court granted Petitioner's motion for appointment of counsel. [Doc. 29.] On January 9, 2009, counsel for Petitioner filed a motion for leave to file a Third Amended Petition. [Doc. 46.] The Court granted the motion on March 5, 2009 and dismissed Respondents' motion to dismiss, without prejudice, as moot. [Doc. 53.]

The Third Amended Petition asserts the following sole ground for relief:

> "Post-trial evidence establishes that Pringle is actually innocent of the crimes for which he was convicted. Pringle's continued detention then is unconstitutional, irrespective of any constitutional error at his trial or sentencing."

[Doc. 69 at 3.] On June 24, 2009, Petitioner filed a motion for discovery, seeking (1) a response from the government as to what happened to the "specimens" tested by the DNA labs, and (2) a

---

[3] Specifically, "Respondents have searched records maintained in counsel-for-Respondents' offices, as well as the California Court of Appeal's (CCA) website, and have been unable to identify any habeas petitions filed by Petitioner between the February 2006 superior court petition and the August 1, 2007 . . . petition [filed in the California Supreme Court]." (Resp't's Mem. in Support of Answer to Third Am. Pet. ("Resp't's Mem.") [Doc. 73-1] at 6.)

copy of the prosecutor's file. [Doc. 59.] The Court denied the motion as it related to the DNA specimens, but granted discovery of the prosecutor's files, limited to:

> (a) All exculpatory evidence in the prosecutor's file that was required to be turned over under Brady v. Maryland, 373 U.S. 83 (1963).
>
> (b) The identification with sufficient particularity of any witnesses or potential witnesses in the underlying criminal conviction.

[Doc. 67 at 5.]

On October 9, 2009, Respondents filed an Answer to the Third Amended Petition. [Doc. 73.] Although entitled an "Answer," Respondents' response renews a procedural challenge to the Petition based on the statute of limitations. Id. at 5-8. With respect to the merits of the Petition, Respondents argue that (1) the claim of actual innocence is not a cognizable basis for federal habeas relief and (2) even if the claim is cognizable, Petitioner fails to satisfy the high standard that the claim would require. Id. at 10-13. On December 10, 2009, Petitioner filed a Traverse, asserting that an evidentiary hearing is required before addressing the procedural issues and merits of a petition alleging actual innocence. [Doc. 78.]

## II. DISCUSSION

**A.  Statute of Limitations**

The Petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244, which provides one year for state prisoners to file a federal habeas corpus petition. The AEDPA states, in pertinent part, that:

> A 1-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

There is no dispute that direct review of Petitioner's conviction became final in 1986.[4] Thus, under Section 2244(d)(1)(A), the Petition is untimely by approximately twenty years. However, Petitioner argues that the statute of limitations does not bar his Petition, because (1) the Petition is timely, under Section 2244(d)(1)(D), due to the late discovery of the DNA test results, and (2) a claim of actual innocence "can never be untimely." (Pet'r's Mem. at 13-14.)

### 1. Newly Discovered Evidence and 28 U.S.C. § 2244(d)(1)(D)

Under the AEDPA, the statute of limitations cannot begin running before "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). The Ninth Circuit's interpretation of this section dictates that "[t]ime begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance." Hasan v. Galaza, 254 F.3d 1150, 1154 (9th Cir. 2001). Here, Petitioner alleges that he did not learn of the DNA test results, the "factual predicate" of his claim of actual innocence, until October 2005. Furthermore, it is not reasonable to assume that due diligence by Petitioner would have revealed the existence of the DNA evidence at an earlier point in time. Thus, the statute of limitations began running in October 2005. However, Petitioner did not file his first federal habeas petition until two years later, so the issue becomes whether statutory tolling is available under the AEDPA.

The AEDPA tolls the 1-year limitations period for the "time during which a properly filed application for State post-conviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). The time that a state habeas petition is "pending" includes each "period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, *provided that the filing of the notice of appeal is timely under state law*." Evans v. Chavis, 546 U.S. 189, 191 (2006)(citing Carey v. Saffold, 536 U.S. 214 (2002))(emphasis in original). However, California's collateral review process employs an indeterminate timeliness rule, requiring only that a petition for appellate review be filed within a "reasonable time." Id. at 191-92. As a result, absent a "clear

---

[4] Based on the record, the exact date is not clear. (See supra footnote 2.)

- 6 -                                                   07cv1960

indication [from the California Supreme Court] that a particular request for appellate review was timely or untimely, the Circuit must itself examine the delay in each case and determine . . . whether the filing . . . was made within what California would consider a 'reasonable time.'" Id. at 197.

In the present case, Petitioner failed to file his petition for review in the California Supreme Court within a "reasonable time." Specifically, the San Diego County Superior Court denied the state habeas petition on April 5, 2006, but Petitioner did not file his petition in the California Supreme Court until August 1, 2007. Moreover, Petitioner does not provide any justification for the delay. In Evans, the U.S. Supreme Court provided the following guidance on unjustified delays in filing for collateral review in California courts:

> Six months is far longer than the "short period[s] of time," 30 to 60 days, that most States provide for filing an appeal to the state supreme court. [citing Saffold, 536 U.S. at 219.] . . . . We have found no authority suggesting, nor found any convincing reason to believe, that California would consider an unjustified or unexplained 6-month filing delay "reasonable." Nor do we see how an unexplained delay of this magnitude could fall within the scope of the federal statutory word "pending" as interpreted in Saffold.

If an unjustified delay of six months is not reasonable within the meaning of Saffold and Evans, then Petitioner's unexplained delay of nearly 16 months is even less reasonable. See also, e.g., Banjo v. Ayers, __ F.3d __, 2010 WL 2403751 (9th Cir. June 17, 2010)(holding under Evans that 146 day delay between state habeas filings was not reasonable); Gaston v. Palmer, 447 F.3d 1165, 1167 (9th Cir. 2006) (holding petitioner is not entitled to "gap tolling" for any of the following delays in state habeas filings: 10 months, 15 months, and 18 months). Therefore, Petitioner's state habeas petition was not "pending" between the Superior Court's denial and the filing for review in the California Supreme Court. Evans, 546 U.S. at 191. Accordingly, these 482 days do not toll the statute of limitations, which renders the Petition untimely under the AEDPA.

**2.  Whether Statute of Limitations Applies to Claim of Actual Innocence**

Whether a showing of actual innocence exempts a federal habeas petition from the AEDPA's statute of limitations is an unsettled question of law. See Majoy v. Roe, 296 F.3d 770, 776 (9th Cir. 2002)(recognizing that the issue is a "legal question not yet decided by this [Ninth] Circuit or the Supreme Court"); see also Souter v. Jones, 395 F.3d 577, 597 (6th Cir. 2005). However, the Supreme Court has repeatedly held that claims of actual innocence can enable a petition to clear

other procedural hurdles.  See, e.g., McCleskey v. Zant, 499 U.S. 467, 495 (1991)(finding an actual innocence exception to the bar against *second* petitions); Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986)(finding an actual innocence exception to the bar against *successive* petitions); Murray v Carrier, 477 U.S. 478, 495-96 (1986)(finding an actual innocence exception to *procedurally defaulted* claims and petitions).  For example, in Murray, the Court stated "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default" to prevent a "fundamental miscarriage of justice."  477 U.S. at 495-96.  Furthermore, in Schlup v. Delo, the Court classified this use of an actual innocence claim as "procedural, rather than substantive," characterizing the claim as "a *gateway* through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  513 U.S. 298, 314-15 (1995) (emphasis added) (internal quotations omitted).  After Schlup, and even after Congress passed the AEDPA, the rule remains that "a petition supported by a convincing Schlup gateway [claim] raises sufficient doubt about the petitioner's guilt to [justify] a review of the merits of the constitutional claims."[5]  House v. Bell, 547 U.S. 518, 537 (2006).  To date, the Supreme Court has not addressed whether the Schlup procedural gateway equally applies to petitions barred by the AEDPA's statute of limitations.

The federal circuits are split on the issue, paving three distinct paths.  Under the first approach, "actual innocence is not a freestanding exception to the . . . one-year statute of limitations."  Araujo v. Chandler, 435 F.3d 678, 682 (7th Cir.2005); see also David v. Hall, 318 F.3d 343, 347 (1st Cir. 2003).  The second approach merges the procedural gateway into the equitable tolling doctrine, such that "a petitioner would have to show some action or inaction on the part of the respondent that prevented him from discovering the relevant facts in a timely fashion, or, at the very

---

[5] The Court indicated that the AEDPA might have "replaced the Schlup standard with a stricter [standard of clear and convincing evidence]" for second and successive petitions, but the petition in House was a procedurally defaulted *first* petition.  Thus, the Court held that "the standard of review in these [AEDPA] provisions is inapplicable."  House, 547 U.S. at 539 (examining 28 U.S.C. § 2244(b)(2)(B)(ii)).  Similarly, the present case involves an untimely first petition, not a second or successive petition.  Accordingly, if this Court finds that there is a Schlup gateway exception to the statute of limitations, the standard of review set forth by Section 2244(b)(2)(B)(ii) will not apply.

1  least, that a reasonably diligent petitioner could not have discovered these facts in time to file a
2  petition within the period of limitations." Flanders v. Graves, 299 F.3d 974, 978 (8th Cir. 2002).
3  Third, as held by the Sixth Circuit, "where an otherwise time-barred habeas petitioner can
4  demonstrate [actual innocence], . . . the petitioner should be allowed to pass through the gateway
5  and argue the merits of his underlying constitutional claims." Souter v. Jones, 395 F.3d 577, 602
6  (6th Cir. 2005); see also Gibson v. Klinger, 232 F.3d 799, 808 (10th Cir. 2000).

The Ninth Circuit has not decided the issue, but two of its decisions suggest a procedural gateway past the statute of limitations. In Majoy, after the district court had dismissed the federal petition as barred by the statute of limitations, the Ninth Circuit stated that if petitioner made a sufficient showing of actual innocence, "then the Schlup gateway *would seem* to open." 296 F.3d at 776 (emphasis added). However, the court refused to decide the issue and remanded for further fact finding, because "[t]his important legal question . . . is not appropriately addressed . . . in a hypothetical context." Id. at 777. Six years later, the Ninth Circuit held that a petitioner failed to make the requisite showing under Schlup to excuse his untimely habeas petition, but the scope of the decision is limited, as the parties agreed that Schlup should govern the issue. Johnson v. Knowles, 541 F.3d 933 (9th Cir. 2008). Thus, although Ninth Circuit precedent is favorable to a procedural gateway through the statute of limitations for valid claims of actual innocence, it is not conclusive.

Despite the absence of a clear rule of law, the fundamental principles underlying the Supreme Court's creation of a procedural gateway support extension of the gateway through the statute of limitations. In Murray v. Carrier, the Court stated that "in appropriate cases the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration." 477 U.S. at 495 (internal quotations omitted). In particular, the Court held that the "conviction of one who is actually innocent" represents this "extraordinary case." Id. at 496. Furthermore, in crafting the standard for the procedural gateway, the Schlup decision reiterated the exceptional nature of an actual innocence claim:

> [T]he individual interest in avoiding injustice is most compelling in the context of actual innocence. . . . Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value

> determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."

Schlup, 513 U.S. at 324-25 (quoting In re Winship, 397 U.S. 358, 372 (1970)(Harlan, J., concurring)). In light of the foregoing, this Court finds that a valid claim of actual innocence, and the implicated "concern about the injustice that results from the conviction of an innocent person," outweighs the interests of procedural adequacy and finality. Therefore, the statute of limitations, as a codification of "finality," must yield to a federal habeas petition that sufficiently demonstrates actual innocence. Accordingly, the Court finds that the Schlup procedural gateway applies to the AEDPA's one-year statute of limitations.

The standard for establishing a Schlup procedural gateway is "demanding." House, 547 U.S. at 538. The petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." Schlup, 513 U.S. at 316. Specifically, the procedural gateway requires the petitioner to "demonstrate that more likely than not, in light of the new evidence, . . . any reasonable juror would have reasonable doubt [of petitioner's guilt]." House, 547 U.S. at 538.

However, even if Petitioner can establish a Schlup gateway, this "does not by itself provide a basis for [habeas] relief." Schlup, 513 U.S. at 315. Instead, the gateway merely enables Petitioner "to have [an] otherwise barred constitutional claim considered on the merits." Id. (internal quotations omitted). For example, in Carriger v. Stewart, the Ninth Circuit found that the petitioner "satisfied the Schlup gateway standard," and as a result, proceeded to "consider the merits of his otherwise [barred] claims of constitutional error" arising from the prosecution's failure to disclose exculpatory evidence. 132 F.3d 463, 479 (9th Cir. 1997). In the present case, Petitioner does not assert any "claims of constitutional error" arising before, during, or after trial, but rather, a freestanding claim of actual innocence. In other words, Petitioner requests habeas relief on account of being factually innocent of the crime, even if his criminal proceedings were free from constitutional error. Thus, the case stands at an impasse. It is futile to pass through a Schlup procedural gateway unless a cognizable constitutional claim waits on the other side. As a result, the central issue becomes whether a freestanding claim of actual innocence is cognizable on federal

habeas review.

### B.     Freestanding Claim of Actual Innocence

Whether a freestanding innocence claim is cognizable under federal law is yet another "open question." District Attorney's Office for Third Judicial Dist. v. Osborne, 129 S.Ct. 2308, 2321 (2009). In Herrera v. Collins, the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. 390, 400 (1993). Nevertheless, "for the sake of argument in deciding [the] case," the Court assumed that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Id. at 417. However, the petitioner fell "far short" of the "extraordinarily high" threshold, and the Court avoided deciding whether freestanding innocence is a cognizable constitutional claim. Id. Since that time, the Court has repeatedly "decline[d] to resolve this issue" of whether the claim exists. House, 547 U.S. at 555; see also, e.g., Osborne, 129 S.Ct. at 2321-22.

Although the Ninth Circuit has similarly refrained from recognizing actual innocence as a freestanding constitutional claim, it has come exceedingly close. In Carriger v. Stewart, the Ninth Circuit observed that "a different majority of the Justices [in Herrera] . . . would have explicitly . . . held" that an "execution of an innocent person would violate the Constitution." 132 F.3d at 476. Next, the court crafted a standard for the actual innocence claim, requiring that the habeas petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." Id. (citing Herrera, 506 U.S. at 442-44 (Blackmun, J., dissenting)). However, upon examination of petitioner's claim, the Carriger court found the evidence of innocence did not meet the high standard and held that "Carriger's freestanding claim of actual innocence must fail." Id. at 477. Thus, in the Ninth Circuit, it is a "well-established *assumption*," but not established law, "that [a] freestanding innocence claim will be cognizable in federal court." Osborne v. District Attorney's Office for Third Judicial Dist., 521 F.3d 1118, 1131 (9th Cir. 2008)(emphasis added), *overruled on other grounds by* District Attorney's Office for Third Judicial Dist. v. Osborne, 129

S.Ct. 2308 (2009).

In the absence of a clearly defined right to bring a freestanding claim of actual innocence in a federal habeas petition, federal courts have refused, in general, to grant relief. A research survey of actual innocence claims in the federal courts, published in 2005, revealed the following:

> Since Herrera was decided, petitioners have presented at least 173 bare-innocence claims squarely before federal courts . . . . No federal court has explicitly provided direct relief on a capital defendant's claim of bare innocence. In only seven cases have federal courts granted some kind of relief based on a petitioner's bare-innocence claim. Of those cases, only once has a court granted an evidentiary hearing. In one other case, a court granted the petitioner the possibility of an evidentiary hearing.

Nicholas Berg, Turning a Blind Eye to Innocence: The Legacy of *Herrera v. Collins*, 42 Am. Crim. L. Rev. 121, 131-37 (2005). Furthermore, the survey did not find, nor can this Court locate, any case in which a federal court has granted a habeas petition and overturned a conviction on the grounds of a freestanding actual innocence claim. Id.

However, the reluctance of the federal courts to grant habeas relief on an innocence claim does not foreclose the viability of the claim. The same notion of substantive justice that justifies the existence of a procedural gateway–that innocent people should not be detained or executed–applies in full force to a freestanding claim. Even in Herrera, the Supreme Court's assumption of a freestanding claim of actual innocence served a specific function:

> it allowed the Court to reach the merits of Herrera's claim and conclude that his showing of innocence was unpersuasive. The assumption therefore served to convey the impression that substantive justice was done in this case, and more generally that the Court values the goal of substantive justice in habeas corpus.

Harv. L. Rev. Ass'n, Actual Innocence Claims, 107 Harv. L. Rev. 273, 280 (1993). More recently, the Supreme Court employed substantive justice by exercising its "original habeas jurisdiction" to transfer a death row inmate's habeas petition to a federal district court to conduct an evidentiary hearing. In re Davis, 130 S.Ct. 1, 1 (2009). Specifically, the petition alleged a freestanding claim of actual innocence, and the Supreme Court directed the district court to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence." Id. In dissent, Justice Scalia characterized the transfer as a "fool's errand," arguing that the AEDPA's standard of review foreclosed habeas relief based on

innocence, because the "Court has *never* held that the Constitution forbids the execution of a convicted defendant who has had a full and fair trial but is later able to convince a habeas court that he is 'actually' innocent." Id. at 3 (Scalia, J., dissenting)(emphasis in original). However, Justice Stevens disagreed, stating "[t]he substantial risk of putting an innocent man to death clearly provides an adequate justification for holding an evidentiary hearing." Id. at 1 (Stevens, J., concurring). Furthermore, Justice Stevens recognized the possibility that "Congress intended actual innocence claims to have special status under [the] AEDPA," and proposed "it is arguably unconstitutional to the extent [Section 2254(d)(1) of the AEDPA] bars relief for a death row inmate who has established his innocence." Id. Justice Stevens concluded his concurrence as follows:

> Without briefing or argument, [Justice Scalia] concludes that Congress chose to foreclose relief and that the Constitution permits this. But imagine a petitioner in Davis's situation who possesses new evidence conclusively and definitively proving, beyond any scintilla of doubt, that he is an innocent man. The dissent's reasoning would allow such a petitioner to be put to death nonetheless. The Court correctly refuses to endorse such reasoning.

Id. at 2. Again, the interest of substantive justice is compelling, such that a death row inmate with conclusive evidence of actual innocence *must* have a right to *seek* relief. The standard of proof might be "extaordinarily high," see Herrera, 506 U.S. at 417, but the right must exist. Accordingly, the Court finds that a freestanding claim of actual innocence, brought by a death row inmate, constitutes a cognizable constitutional claim.

The next issue is whether the constitutional right exists in the non-capital context, as well. In Herrera, the Supreme Court reiterated that it has "refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus." 506 U.S. at 405 (quoting Murray v. Giarratano, 492 U.S. 1, 9 (1989)). The Ninth Circuit recently cited this language to suggest that if a freestanding claim of actual innocence exists, capital and non-capital cases should receive "equal treatment." Osborne v. District Attorney's Office for Third Judicial Dist., 521 F.3d 1118, 1130 (9th Cir. 2008)(citing Herrera, 506 U.S. at 405), *overruled on other grounds by* District Attorney's Office for Third Judicial Dist. v. Osborne, 129 S.Ct. 2308 (2009). In light of the foregoing, in both capital and non-capital cases, the Court finds that a freestanding claim of actual innocence constitutes a cognizable constitutional claim, subject to federal habeas corpus review.

Thus, in the present case, the Third Amended Petition contains a cognizable constitutional claim. As a result, if Petitioner succeeds in establishing a procedural gateway under Schlup v. Delo, the Court can consider the underlying constitutional claim of actual innocence on the merits.

**C.    Legal Standards**

Although both the Schlup procedural gateway and the freestanding claim of actual innocence only apply to "extraordinary" cases, "the threshold for making out a [procedural gateway claim] is lower than the . . . threshold for freestanding (Herrera) claims of innocence." Carriger, 132 F.3d at 477. In order to pass through the procedural gateway, "a petitioner must show that in light of all the evidence, including new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Id. at 478 (quoting Schlup, 513 U.S. at 327); see also House, 547 U.S. at 538 ("A petitioner's burden at the gateway stage is to demonstrate that more likely than not . . . any reasonable juror would have reasonable doubt.").

In contrast, "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt." Carriger, 132 F.3d at 476. As Justice Blackmun explained in his dissent:

> [A] conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. . . . When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

Herrera, 506 U.S. at 443 (Blackmun, J., dissenting); accord Herrera, 506 U.S. at 399-400 (majority opinion)(noting that "[o]nce a defendant has been afforded a fair trial and convicted of the offense, . . . the presumption of innocence disappears"). Thus, the standard must be "extraordinarily high," and the demonstration of evidence must be "truly persuasive." Herrera, 506 U.S. at 417. Specifically, a petitioner "must affirmatively prove that he is probably innocent." Carriger, 132 F.3d at 476.

Petitioner argues that an application of these standards, at present, would be premature, because the Court must first conduct an evidentiary hearing. (Traverse at 5.) However, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a

1  hearing could enable an applicant to prove the petition's factual allegations, which, *if true*, would
2  entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007).
3  Thus, before granting an evidentiary hearing, the Court will apply the legal standards for a
4  procedural gateway and a freestanding claim of actual innocence to the facts and evidence in the
5  present case, but the Court will assume that the Petition's factual allegations of newly discovered
6  evidence are true.

**D.     Examination of the Facts and Evidence**

    **1.     Material Evidence From Trial in San Diego County Superior Court**

9         At trial, the prosecution introduced eye witness testimony as the central component to its
10 case in chief. Desiree Coleman, the victim, testified to her rape and identified both Frederick Daye
11 and Petitioner as her assailants. (Pet'r's Mem. at 6.) Furthermore, Darren Wells, the sole witness to
12 Coleman's abduction, testified that he knew Petitioner from junior high school and observed him
13 enter the back seat of Coleman's car. (Reporter's Transcript on Appeal ("RT"), Lodg. 6, June 19,
14 1984 at 240-242.) Wells also stated that Daye was the other assailant. Id. at 242.

15        In addition, the prosecution introduced evidence of blood taken from semen stains found on
16 Coleman's pants and the carpet of the car. Specifically, the semen stains of blood type "B" were
17 found, which is Petitioner's blood type. (Cal. Court of Appeal's opinion of Jan. 8, 1986 [Lodg. 2] at
18 3.) Both Coleman and Daye have blood type "O." Id.; (Pet'r's Mem. at 6.) The prosecution's
19 expert witness testified that "[a]pproximately eighteen percent of black males have ABO blood type
20 "B" while only three to five percent of the general population are within [Petitioner's] entire blood
21 grouping." (Cal. Court of Appeal's opinion [Lodg. 2] at 3.)

22        The defense presented a theory of mistaken identity. In support, Petitioner testified to an
23 alibi, stating that he attended a party thrown by Ethel Gonzalez until the afternoon, at which time he
24 drove Gonzalez to the Metropolitan Correctional Center ("MCC"), and then the border station in
25 San Ysidro, in search of Gonzalez's husband. Id. at 3-4. Witnesses, including Gonzalez, testified
26 for the defense in support of this alibi. In response, the prosecution presented evidence that the
27 MCC's log book contained ambiguous evidence of the visit, and furthermore, that Petitioner told
28 police, at the time of his arrest, that he had been in Fresno the night of Coleman's abduction. Id.

### 2. Exoneration of Daye

Daye was convicted in a separate trial, and the California Court of Appeal affirmed the conviction, stating that the eye witness testimony of Coleman and Wells was "overwhelming direct evidence of his guilt." People v. Daye, 223 Cal. Rptr. 569, 581 (1986). However, in 1993, on state habeas review, Daye obtained DNA testing of the four semen samples collected from Coleman's pants and the car's carpet. (Resp.'s Ans. at 9.); (Pet'r's Mem. at 8.) The government performed independent testing. Based on the results of the DNA testing, Daye was released from custody. Id.

### 3. Petitioner's Post-Trial Confessions

Respondent identifies four instances in which Petitioner has confessed to his participation in the crime for which he was convicted: (1) Petitioner's declaration of February 1, 1990, submitted by Daye in support of his state habeas petition; (2) and (3) Petitioner's statements submitted for parole consideration hearings; and (4) Petitioner's alleged statement, in 1994, to a Deputy District Attorney who interviewed Petitioner during his investigation of Daye's habeas petition. (Resp.'s Opp. to Mot. for Disc. [Doc. 61], Exs. A, B, C); (Atkins Decl. [Lodg. 4]). However, the Court is currently reviewing whether Petitioner has stated a *colorable* claim of actual innocence sufficient to warrant an evidentiary hearing. See generally Schriro, 550 U.S. at 474 (holding that court must accept Petitioner's factual allegations as true in deciding whether an evidentiary hearing is warranted). Thus, without first conducting an evidentiary hearing, at which Petitioner would have an opportunity to explain his motivations for making these statements, the Court cannot consider the statements <u>for any purpose</u>.

### 4. The DNA Evidence

During the original investigation, police found and collected four semen samples from the left knee, right knee, and crotch area of Coleman's jeans, and a stain on the carpet of the car. As stated earlier, Daye obtained DNA testing of the semen samples, which was conducted by Cellmark, a DNA testing lab. (Pet'r's Mem. at 8.) In April 1994, Cellmark delivered the results of the tests, which demonstrated that Daye was not the source for the left knee stain. Id. The test provided no conclusions as to any of the other stains. Id.

The government then conducted its own tests on the three stains from Coleman's jeans, but

not the carpet stain. (Pet'r's Mem. at 8.) First, the results were inconclusive as to the right knee stain. Second, the test concluded that neither Petitioner nor Daye was the source of the left knee stain. Third, the government interpreted that Petitioner's DNA was "consistent" with the crotch stain sample. More specifically, "Pringle, along with 1 in every 2000 African Americans, had a DNA marker that would be consistent with the DNA marker found in the [crotch] semen stain." Id.

Later, Cellmark released a second report in which it determined that Petitioner could not have been the source of the left knee stain. (Pet'r's Mem. at 8.) However, Cellmark did not reach a conclusion with respect to the carpet stain, and the lab did not receive samples from either the crotch or right-knee stain. Id.

It is not clear whether Petitioner disputes the statistical evidence that demonstrated Petitioner's DNA was "consistent" with the crotch stain sample. See (Pet'r's Mem. at 12-13.) At a minimum, Petitioner concedes that the DNA evidence is inconclusive as to the stains from the carpet, the crotch of Coleman's jeans, and the right-knee of the jeans. Id. at 8-9. Thus, assuming Petitioner's factual allegations to be true, and resolving ambiguities in favor of Petitioner, the Court at this stage finds that the DNA evidence proved inconclusive.

**E.     Petitioner Establishes Procedural Gateway**

The facts alleged in the Petition, if true, are sufficient to establish a procedural gateway under Schlup v. Delo, 513 U.S. 298 (1995). First, the DNA evidence, although inconclusive, does not link Petitioner to any of the collected semen samples. Second, the DNA evidence exonerated Daye. This is significant, because at Daye's trial, the prosecution's case-in-chief relied heavily on the same eye witness testimony of Coleman and Wells. (Pet'r's Mem. at 12-13); People v. Daye, 223 Cal. Rptr. 569, 581 (1986). Thus, the DNA evidence, which conclusively demonstrated that Daye did not participate in the crime, eviscerates the credibility of Coleman and Wells as to their identification of Daye. Similarly, it represents strong evidence to impeach their identification of Petitioner. For example, if Coleman's identification of Daye was "unequivocal," Daye, 223 Cal. Rptr. at 574, and has since been proven erroneous, then Coleman's credibility, with respect to the traumatic experience of her abduction and rape, now stands substantially diminished.

Without credible eye witness testimony, the case against Petitioner reduces to a blood sample

analysis that is far from conclusive. The abduction took place in a minority neighborhood, (RT, Lodg. 6, June 19, 1984 at 243), and Coleman reported that her assailants were black. Thus, the appropriate statistical significance of the blood type match is that "eighteen percent of black males" share blood type "B." (Cal. Court of Appeal's opinion [Lodg. 2] at 3.) In sum, the Petition's allegations, if true, demonstrate that the prosecution's case lacks credible eye witness testimony, and instead, consists of only a blood match with an eighteen percent margin of error. Based thereon, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327. Therefore, pending an evidentiary hearing, Petitioner has established a procedural gateway, and IT IS RECOMMENDED that the AEDPA's statute of limitations should not bar consideration of the Petition on the merits. Carriger, 132 F.3d at 479. However, before granting an evidentiary hearing, the Court must first examine whether the factual allegations of the Petition, if true, satisfy the higher standard for establishing a freestanding claim of actual innocence.

### F.     Petitioner Fails to Affirmatively Prove Actual Innocence

A freestanding claim of actual innocence under "Herrera requires more convincing proof of innocence than [a] Schlup [procedural gateway]." House, 547 U.S. at 555. In House, the Supreme Court held that petitioner had established a procedural gateway under Schlup, highlighting "the central forensic proof connecting House to the crime–the blood and the semen–has been called into question, and House has put forward substantial evidence pointing to a different suspect." Id. at 554. However, the Court emphasized that the threshold for a freestanding claim is "extraordinarily high" and held "that House's showing falls short of the threshold implied in Herrera." Id. at 555.

In light of this demanding standard, the Court finds that Petitioner has failed to establish a freestanding claim of actual innocence under Herrera. First, Petitioner falls short of the showing that the petitioner made in House. For example, Petitioner does not challenge the validity of the forensic blood analysis, which matched at least one semen stain to Petitioner's blood type, to the exclusion of eighty-two percent of the black male population. Second, Petitioner does not "affirmatively prove" his innocence. Carriger, 132 F.3d at 476. In fact, Petitioner's central argument is that without the testimony of Coleman and Wells, "the Government had no case against Pringle." (Pet'r's Mem. at

1  12.)  But the lack of a case against Petitioner is not grounds for habeas relief.  If "a defendant has
2  been afforded a fair trial and convicted of the offense for which he was charged, *the presumption of*
3  *innocence disappears*."  Herrera, 506 U.S. at 399 (emphasis added)(citing Ross v. Moffitt, 417 U.S.
4  600, 610 (1974)).  As a result, "the burden of proving innocence must shift to the convicted
5  defendant."  Id. at 443 (Blackmun, J., dissenting).  In other words, even if the Government cannot
6  produce *any* evidence of Petitioner's guilt, Petitioner is not entitled to release from custody, based
7  on the instant Petition, unless he proves his own innocence.
8       Petitioner has not met his burden of proving innocence.  At best, the DNA evidence is
9  inconclusive.  Moreover, the test matching the semen sample to Petitioner's blood type is
10 uncontradicted.  In fact, the alibi is the only affirmative proof that Petitioner offers in support of his
11 innocence, but the alibi is not newly discovered evidence.  Instead, Petitioner relies on the same
12 testimony presented at trial, the same testimony that a jury discredited in rendering a guilty verdict.
13 In conclusion, even assuming the factual allegations of the Petition are true, Petitioner fails to meet
14 the "extraordinarily high" threshold of a freestanding claim of actual innocence.  Accordingly, there
15 is no reason to hold an evidentiary hearing, and IT IS RECOMMENDED that the Court **DENY** the
16 Petition in its entirety.

### III. CONCLUSION AND RECOMMENDATION

18     The Court submits this Report and Recommendation to United States District Judge Larry
19 Alan Burns under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District
20 Court for the Southern District of California.  For the foregoing reasons, **IT IS HEREBY**
21 **RECOMMENDED** that the request for an evidentiary hearing be **DENIED**, and the Petition for
22 Writ of Habeas Corpus be **DENIED** in its entirety.  **IT IS FURTHER RECOMMENDED** the
23 Court issue an Order:  (1) approving and adopting this Report and Recommendation; and (2)
24 directing that Judgment be entered denying the Petition.
25     **IT IS HEREBY ORDERED** that any party to this action may file written objections with
26 the Court on or before **July 23, 2010**, and serve a copy on all parties.  The document should be
27 captioned "Objections to Report and Recommendation."
28 //

1    **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and
2    served on all parties no later than **August 6, 2010**.  The parties are advised that failure to file
3    objections within the specified time may waive the right to raise those objections on appeal of the
4    Court's Order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d
5    1153, 1156 (9th Cir. 1991).

6    IT IS SO ORDERED.

8    DATED: June 22, 2010

10   LOUISA S PORTER
     United States Magistrate Judge

13   cc   The Honorable Larry A. Burns
          All parties